UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


DUKES BRIDGE LLC and          )
STANLEY MILLER, Trustee of    )
the TPCS Corporation          )
Irrevocable Life Insurance    )
Sub-Trust,                    )
                              )
            Plaintiffs,       )    CIVIL ACTION NO.
                              )    10-10877-DPW
v.                            )
                              )
GILBERT D. BEINHOCKER and     )
LEONARD PHILLIPS,             )
Individually and as Trustee   )
of the TPCS Corporation       )
Irrevocable Life Insurance    )
Trust,                        )
                              )
            Defendants.       )
                              )


MEMORANDUM AND ORDER
September 19, 2012

Plaintiffs Dukes Bridge LLC and Stanley Miller seek damages

from Defendants Gilbert Beinhocker and Leonard Phillips for

breach of contract and breach of fiduciary duty.  Plaintiffs have

moved for summary judgment, alleging that Beinhocker and Phillips

admit they breached the contract at issue.  Defendants oppose the

plaintiffs' motion and have filed a cross-motion for summary

judgment, arguing that the Non-Contravention Agreement giving

rise to the breach of contract claim is unenforceable because

Aqua Blue, Dukes Bridge's assignor, never signed the Agreement,

and that under either claim Dukes Bridge and Miller cannot prove

damages.  I will grant Plaintiffs' motion for summary judgment as

to the liability of Phillips and the cross-motion of the
defendants as to the claims of Miller and the liability of
Beinhocker and direct the parties to prepare the case for an
assessment of damages.

## I.  BACKGROUND

A.    The Parties

Dukes Bridge LLC is a limited liability corporation.
Stanley Miller is the Trustee of the Tamper Proof Container
Systems Corporation Irrevocable Life Insurance Sub-Trust (the
"Sub-Trust").

Gilbert Beinhocker and Leonard Phillips own and operate
Tamper Proof Container Systems Corp.  Beinhocker is the insured
individual under the insurance policy at issue here.  Phillips is
the Trustee of the Tamper Proof Container Systems Corporation
Irrevocable Life Insurance Trust (the "TPCS Trust").

B.    Stranger-Originated Life Insurance

So called "stranger-originated life insurance" plans are an
offshoot of the viatical-settlement industry that developed in
the 1980s when investors purchased the life insurance policies of
terminally ill AIDS patients.[1]  "Stranger-

---

[1]  A Fourth Circuit opinion has described the viatical-settlement
industry:

> The viatical settlements industry was born in the 1980s
> in response to the AIDS crisis.  In the early years,
> AIDS was a rapidly fatal disease, and its victims
> usually died within months of diagnosis.  Many AIDS

originated life insurance" ("STOLI") plans allow an insured to buy a large life insurance policy with a loan from an investor who is named as the beneficiary of the policy.  For the first two years,[2] the insured pays the premiums using the loan from the investor.  After two years, the insured sells the policy to the investor for what is usually a substantial cash payment, and upon death of the insured, the investor receives the life insurance proceeds.

A typical complex stranger-originated life insurance transaction may be structured as follows:

> An agent attempts to sell a life insurance policy to an elderly insurable candidate, and offers the candidate up-front cash in exchange for promising a future sale

---

> sufferers were in great need of cash to pay for their care after they had become debilitated.  Their life insurance policies were not only expensive to maintain but could, upon liquidation, provide some of the desperately needed cash.  Moreover, investors were willing to purchase the life insurance policies of AIDS sufferers.  Inasmuch as AIDS sufferers had predictably short life expectancies, their policies were reliable investments.

*Life Partners, Inc.* v. *Morrison*, 484 F.3d 284, 287-88 (4th Cir. 2007).

[2]  Insurance policies frequently contain an incontestability clause, in which the insurer agrees that after a policy has been in force for a given period of time (here, two years), it will not contest the validity of the policy based on any misrepresentations made in the policyholder's application. Bertram Harnett & Irving I. Lesnick, *The Law of Life and Health Insurance* § 5.07 (Matthew Bender, Rev. ed. 2010).  Forty-three states have mandatory incontestability clauses for life insurance policies, and as a practical effect nearly all life insurance policies contain them.  *Id.*

of the policy.  The agent informs the candidate that
the candidate will be able to obtain the policy at
virtually no cost to himself, because the agent has
secured non-recourse financing to purchase the policy.
The candidate then acts as a "nominal grantor" of a
life insurance trust that is used to apply for the
policy.  "At that time, the agent will tell the insured
that, in all probability, the policy will be sold to
investors for a price that will pay the loan and
accrued interest, leaving a profit to split between the
agent and the insured . . . . If the insured survives
[the two-year contestability period on the policy], the
owner (the life insurance trustee) typically has two
options, in addition to the sale of the policies to
investors:  (1) have the insured pay the outstanding
debt with accrued interest and retain the policy; or
(2) transfer the policy to the lender in lieu of
foreclosure."

*Lincoln Nat. Life Ins. Co. v. Calhoun*, 596 F. Supp. 2d 882, 885

(D.N.J. 2009) (quoting Alan Jensen & Stephan R. Leimberg,

*Stranger-Owned Life Insurance:  A Point/Counterpoint Discussion*,

33 AM. C. TR. EST. COUNS. L.J. 110, 111 (2007)).

Numerous states have passed legislation attempting to curb,

and sometimes ban, the practice.  *See, e.g.*, N.Y. Ins. Law § 7815

(banning stranger-originated life insurance transactions); H.B.

660, 2009 Sess. (N.H. 2010) (banning the use of third parties to

apply for life insurance and increasing the contestability period

to five years); S.B. 513, 2009-2010 Leg. (Wis. 2009) (increasing

the contestability period to five years and instituting other

controls on their sale).  Insurers, perhaps recognizing the

danger that such transactions presented to their actuarial profit

models, have also tried to curb the practice.  *See, e.g.*,

*Principal Life Ins. Co.* v. *DeRose*, Civil Action No. 1:08-cv-2294,

2011 WL 4738114, at *1 (M.D. Pa. October 5, 2011) (involving a policy that explicitly prohibited any form of stranger-originated life insurance or non-recourse premium financing).

## C.   Facts

### 1.   Background

Tamper Proof Container Systems Corp. ("TPCS") is a corporation that engineered and marketed a new method for detecting intrusions in shipping containers.  Beinhocker and Phillips each own one-third of the shares of TPCS, and Beinhocker is TPCS's sole employee.  Although TPCS has a corporate form, Beinhocker has characterized TPCS as essentially a 50/50 partnership between him and Phillips.

Beginning in 2007, Beinhocker was approached by Richard Salvato, an insurance broker with Bentley Assets, to gauge his interest in buying a STOLI policy.[3]  Although Beinhocker had initially declined the offer, by 2008 he reconsidered.  At that time, TPCS was having difficulty raising capital due to the financial market crash and could not meet operating expenses or pay Beinhocker and Phillips a salary sufficient to cover their

---

[3]  Plaintiffs characterize the policy as a "key-man" policy.  A key-man policy refers to "[l]ife insurance taken out by a company on an essential or valuable employee, with the company as beneficiary."  *Black's Law Dictionary* 1010 (9th ed. 2009). Nevertheless, because I will grant Plaintiffs' motion for summary judgment, I recite the facts, including the characterization of the life insurance policy, in the light most favorable to Beinhocker and Phillips.

living expenses.  Beinhocker and Phillips saw the STOLI policy as a way to get much needed capital for TPCS and to pay for their own living expenses, so they agreed with Salvato to set up two STOLI policies in the amount of $10 million each.  They expected to sell the first $10 million policy to net them $300,000 (later reduced to $200,000) up front, and to sell the second $10 million policy, the policy at issue in this case, for one to two million dollars after two years.[4]

Bentley Assets set up the transaction and provided the closing documents which were reviewed by Beinhocker and his counsel in advance of closing.  Those closing documents created the TPCS Trust,[5] which was established to hold the life insurance policies.  Phillips was named the Trustee of the TPCS Trust and signed the Trust Agreement.  The TPCS Trust is governed by Massachusetts trust law.

Bentley Assets filled out Beinhocker's application for the two $10 million life insurance policies with John Hancock Life Insurance Company.  Beinhocker reviewed the application, signed

---

[4]  Bentley Assets let the first policy lapse after being unable to sell it.  Only the second policy is at issue in this case, so all further references to the life insurance policy refer to the second $10 million policy issued by John Hancock.

[5]  In fact, the TPCS Trust was created before closing, on March 15, 2008.  However, it was amended at closing to allow for the creation of the Sub-Trust necessary for Beinhocker and Phillips to obtain the loan from Aqua Blue, discussed *infra*.  All references to the TPCS Trust thus reference the Trust as amended by the July 10, 2008 First Trust Amendment.

it, and sent it to John Hancock.  Although the application asked whether "any party, other than the Owner, [would] obtain any right, title or interest in any policy issued" and whether "all or part of the premium [would] be financed," both of which were contemplated by Phillips and Beinhocker, Beinhocker signed his name to the application with both of those questions answered "No."  John Hancock issued policy number 94139409 to the TPCS Trust on June 12, 2008, insuring Beinhocker in the amount of $10 million.  The first year's planned premium was $477,079 and for years two through twenty-four, the planned annual premium was $441,865.

Because Beinhocker and Phillips could not afford the annual premiums, they sought a loan from Aqua Blue Wealth Management, LLC to cover the cost ($918,944 in premium payments) for the first two years until Beinhocker and Phillips could sell the life insurance policy.  As a condition of the loan, Aqua Blue required that Beinhocker and Phillips create the Sub-Trust at closing and transfer the life insurance policy to the Sub-Trust as collateral for the loan.  Unlike the TPCS Trust, the Sub-Trust is governed by Delaware trust law.

At the time of the lapse, the Sub-Trust had used the Aqua Blue loan to pay the first-year premium of $477,079 and $288,600 of the second-year premium.  Aqua Blue also incurred $79,439.74 in costs administering the loan.  Under the Specialty Finance

Loan Agreement, interest accrued on the Aqua Blue loan in the
amount of 10% per annum, compounded on a daily balance basis.   In
the event of a default, the interest rate increased to 13% on the
amount in default from the date payment was due.

    2.   *Closing the Deal*

    Closing occurred on July 10, 2008.   The closing involved a
number of documents: (1) an amendment to the TPCS Trust Agreement
allowing for the creation of a Sub-Trust; (2) the Sub-Trust
Agreement, creating the Sub-Trust; (3) the Assignment of Assets
which assigned the life insurance policy to the Sub-Trust; (4)
the Acceptance of Appointment naming Miller as the Trustee of the
Sub-Trust; and (5) the Specialty Finance Loan Agreement, which
consisted of (a) an Assignment Agreement between the Sub-Trust
and Aqua Blue, whereby the life insurance policy was put up as
collateral, and (b) a Promissory Note in the amount of $935,417
to pay the first two years worth of premium payments on the life
insurance policy.

    Also at the closing, Beinhocker, Phillips, and Miller signed
a Non-Contravention Agreement, which was additional consideration
for the Specialty Finance Loan Agreement.   The Non-Contravention
Agreement provided that Beinhocker and Phillips "have not, and
will not, contravene or take any action that will cause an event
of default under the Specialty Finance Loan Agreement or any
other contract, understanding, or commitment described in the

8

Loan Documents."  § 3.1.  By signing the Agreement, Beinhocker and Phillips agreed "that they will not tender, exchange, sell, offer to sell, transfer, pledge, assign, hypothecate, or otherwise dispose of, or encumber with any Lien, the Life Policy without the prior, written consent of [Miller]."  § 3.2.  They further agreed "that they will not make any withdrawals from or obtain any policy loans against the Life Policy without the prior, written consent of [Miller]," § 3.3, nor would they "communicate verbally or in writing with the Insurer without the prior written consent of [Miller]."  § 3.5.  Finally, Beinhocker and Phillips agreed to hold Aqua Blue and Miller harmless for "any and all loss, liability, or damage resulting from any breach or non-fulfillment" of the Non-Contravention Agreement, and "any and all actions, suits, proceedings, claims, demands, assessments, judgments, out-of-pocket costs and expenses, including without limitation, legal fees and expenses incident to" the breach.  § 4.1.  Beinhocker, Phillips, and Miller signed the agreement.

      3.  *Policy Lapse*

      In early 2009, Beinhocker and Phillips began to be concerned that Bentley Assets would be unable to sell the life insurance policy to investors and pay them the proceeds that had been discussed.  Beinhocker said he became concerned that Bentley Assets would sell his life-insurance policy to "any anonymous

party in Russia or Asia" who "would have a $10 million incentive to have [him] anonymously assassinated."

To recover some benefit from their STOLI transaction, Beinhocker and Phillips sought a loan from John Hancock against the life insurance policy in the amount of $200,000, an amount that had been allegedly promised to them by Bentley Assets. Phillips, with Beinhocker's knowledge but without Miller's consent, contacted John Hancock directly numerous times to discuss taking out a loan.

Phillips applied for the $200,000 loan on August 10, 2009 as Trustee for the TPCS Trust, despite the fact that at that point he had already assigned the life insurance policy to the Sub-Trust.  The loan agreement provided that the "loan must be repaid to the applicable issuing company with interest, or the loan amount plus interest will be deducted from any proceeds paid by this policy for the cash surrender value or death benefit." Beinhocker and Phillips never intended to repay the loan, and Beinhocker admitted that he took out the loan to facilitate the lapse of the policy.  Phillips admitted that he and Beinhocker had signed the Non-Contravention Agreement, and that in doing so they had promised not to take out a loan.  Phillips also admitted that by taking out the loan, his actions breached the Non-Contravention Agreement.

On August 21, 2009, John Hancock approved the loan with a
6.75% interest rate and paid Phillips $200,000, which he split
evenly with Beinhocker.  John Hancock included a letter with its
check explaining that "[i]f at any time the loan balance exceeds
the cash value of the policy, coverage may lapse."

As a result of the loan, the life insurance policy's future
premium reserves fell below the net cash surrender value by
$53,993.28, causing the policy to enter the sixty-one day grace
period.  John Hancock sent Phillips a letter informing him of the
shortage on October 9, 2009.  The letter was forwarded to
Beinhocker.  Beinhocker and Phillips did not inform Miller or
Aqua Blue of the loan, nor did they inform Miller or Aqua Blue
that the life insurance policy was in its sixty-one day grace
period and would expire without further action.  Neither
Beinhocker nor Phillips did anything to cure the account shortage
or prevent the lapse of the policy.

On November 2, 2009, Dukes Bridge LLC acquired Aqua Blue's
loan to Beinhocker and Phillips by assignment, and provided
notice to them on December 14, 2009.  On December 18, Phillips
received notice from John Hancock that as of December 9, 2009,
the life insurance policy had lapsed for non-payment.

D.  Procedural History

On May 25, 2010, Dukes Bridge and Miller filed suit against
Beinhocker and Phillips for breach of the Non-Contravention and

11

Sub-Trust Agreements, and for breach of Phillips's fiduciary duty to the Sub-Trust.  Now before me is their motion for summary judgment as to both claims.  For their part, Beinhocker and Phillips have filed a cross motion for summary judgment barring their liability.

## II.  STANDARD OF REVIEW

A movant is entitled to summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party," and "[a] fact is material if it has the potential of determining the outcome of the litigation." *Farmers Ins. Exch.* v. *RNK, Inc.,* 632 F.3d 777, 782 (1st Cir. 2011) (citation omitted).  However, "conclusory allegations, improbable inferences, and unsupported speculation" are insufficient to create a genuine issue of material fact to survive summary judgment.  *Sullivan* v. *City of Springfield*, 561 F.3d 7, 14 (1st Cir. 2009) (quotation and citation omitted).

As I must, I "view the facts in the light most favorable to the party opposing summary judgment." *Rivera-Colón* v. *Mills,* 635 F.3d 9, 10 (1st Cir. 2011).  Because I am addressing cross-motions for summary judgment, I "must view each motion,

separately, through this prism." *Estate of Hevia* v. *Portrio Corp.*, 602 F.3d 34, 40 (1st Cir. 2010).

## III.  DISCUSSION

Under Massachusetts law, to prove a breach of contract, plaintiffs must show (1) the existence of a valid and enforceable agreement, (2) that the defendants breached the agreement through their acts or omissions, and (3) that the plaintiffs were harmed by the defendants' breach. *Gemini Investors Inc.* v. *Ameripark, Inc.*, 643 F.3d 43, 48 (1st Cir. 2011).  An agreement is valid and enforceable if there is a manifestation of mutual assent to be bound, coupled with consideration given by each party. *Stagikas* v. *Saxon Mortg. Servs., Inc.*, 795 F. Supp. 2d 129, 136 (D. Mass. 2011).

A.  Valid and Enforceable Agreement

1.  *Dukes Bridge*

Beinhocker and Phillips allege that Aqua Blue never signed the Non-Contravention Agreement, and therefore Dukes Bridge cannot meet its burden of proving that the Non-Contravention Agreement is valid and enforceable against them.  Dukes Bridge has produced two copies of the Non-Contravention Agreement, both of which show the signatures of Beinhocker, Phillips, and Miller. Neither copy is signed by Aqua Blue, however.

A non-signatory to a contract may nonetheless enforce a contract under Massachusetts law if the third-party plaintiff can

"show that [it] was the intended beneficiary of the contract, not merely an incidental one." *Katz* v. *Pershing, LLC*, 806 F. Supp. 2d 452, 459, at *4 (D. Mass. 2011) (citations omitted).  The third-party plaintiff "must show with special clarity that the contracting parties intended to confer a benefit on [it]" in order to be able to enforce the contract.  *McCarthy* v. *Azure*, 22 F.3d 351, 362 (1st Cir. 1994).

Here, the evidence is clear that the parties intended for Aqua Blue (now Dukes Bridge, via assignment) to benefit from the Non-Contravention Agreement.  The preamble to the Agreement notes that it was "entered into by and between" Beinhocker, Phillips, Miller, and Aqua Blue, even though Aqua Blue does not appear on the signature page of the agreement.  The third "whereas" clause in the preamble notes that Aqua Blue would make the loan discussed in the Specialty Finance Loan Agreement "*provided that* [Phillips] and [Beinhocker] also agree to execute [the Non-Contravention Agreement] contemporaneously with the execution and delivery of the Specialty Finance Loan Agreement and other Loan Documents by [Miller] and [Aqua Blue]."  And the "now, therefore" clause immediately following states that the terms of the Non-Contravention Agreement are valuable consideration necessary "*in order to induce* [Miller] and [Aqua Blue] to enter into the Loan Agreement."  Finally, under the indemnification section of the Agreement, Beinhocker agreed "to indemnify and hold [Miller] and

14

[Aqua Blue] harmless" in the event of a breach by Beinhocker or Phillips of the Non-Contravention Agreement.  § 4.1.

Thus, even though there is no evidence Aqua Blue signed the Non-Contravention Agreement, it is apparent from the terms of the Agreement that Aqua Blue was an intended third-party beneficiary thereof.  Further, Aqua Blue manifested its intent to be bound by the Non-Contravention Agreement by entering into a loan transaction with Miller that was supported, in part, by the Non-Contravention Agreement as consideration.  I conclude that Dukes Bridge, as Aqua Blue's assignee, can sue Beinhocker and Phillips for breach of the agreement.

2.   *Miller*

As to whether the Non-Contravention Agreement is valid with respect to Miller, Beinhocker and Phillips allege that Miller did not sign the Non-Contravention Agreement at the time of the closing, and therefore the later signature page with his signature is of questionable authenticity.  However, even if Beinhocker and Phillips are correct that Miller's signature was only added after the fact, "[a] written contract, signed by only one party, may be binding and enforceable even without the other party's signature if the other party manifests acceptance." *Haufler* v. *Zotos*, 845 N.E.2d 322, 332 (Mass. 2006).

Here, the uncontroverted evidence in the record shows that Miller manifested his acceptance of the Non-Contravention

Agreement, and therefore it is a valid and enforceable agreement. Phillips appointed Miller as the Trustee of the Sub-Trust, and Miller accepted the appointment.  The Non-Contravention Agreement noted that by signing the agreement, Beinhocker and Phillips "acknowledge and agree that [Miller] is about to enter into a loan arrangement with [Aqua Blue]," the details of which had been provided to and reviewed by them in advance of closing.  The Agreement also noted that Aqua Blue was willing to make the loan to Beinhocker and Phillips "provided that [Phillips] and [Beinhocker] also agree to execute [the Non-Contravention Agreement] contemporaneously" with the loan to Miller.  Indeed, the next paragraph notes that the terms of the Non-Contravention Agreement were necessary "in order to induce [Miller] and [Aqua Blue] to enter into the Loan Agreement."

After Beinhocker and Phillips signed the Non-Contravention Agreement, Miller entered into the Specialty Finance Loan Agreement with Aqua Blue, and took assignment of the life insurance policy as collateral.  Aqua Blue paid Miller an amount sufficient (at the time) to cover the premiums to John Hancock for the life insurance policy, and Miller in turn paid those premiums as Trustee of the Sub-Trust.  This is sufficient evidence to show that Miller intended to be bound by the Non-Contravention Agreement, and thus is sufficient to manifest his contemporaneous acceptance, even if Beinhocker and Phillips are

16

correct that he did not actually sign the Non-Contravention
Agreement or did so belatedly.

Beinhocker and Phillips do not dispute that the Non-
Contravention Agreement was supported by valid consideration.
Therefore, a binding contract existed between Beinhocker,
Phillips, and Miller.

B.   Breach

Assuming that the Non-Contravention Agreement was valid and
enforceable, Beinhocker and Phillips cannot genuinely dispute
that they breached it.  By taking out the $200,000 loan,
Beinhocker and Phillips acted in direct contravention of sections
3.1, 3.3, and 3.5 of the Agreement.  Under those sections,
Beinhocker and Phillips agreed not to (1) "take any action that
will cause an event of default" § 3.1; (2) "make any withdrawals
from or obtain any policy loans against the Life Policy without
the prior, written consent of [Miller]," § 3.3; or (3)
"communicate verbally or in writing with the Insurer without the
prior written consent of [Miller]."  § 3.5.  Beinhocker and
Phillips admit that their actions broke all three of those
covenants.

Phillips contacted John Hancock without prior approval from
Miller to inquire about obtaining a loan, in direct violation of
section 3.5.  Beinhocker and Phillips obtained the $200,000
policy loan against the life insurance policy without Miller's

consent, in direct violation of section 3.2.  And by taking out the loan, as Beinhocker described it, they "facilitated the lapse of the policy" in direct violation of section 3.1.

The evidence is uncontroverted that Beinhocker and Phillips breached a valid and enforceable Non-Contravention Agreement.[6]

C.  Damages

Beinhocker and Phillips argue that Dukes Bridge and Miller cannot prove damages, and therefore cannot prevail on their claims.  They make three[7] distinct arguments, which I address in turn.

1.  *Miller Cannot Show Damages*

Beinhocker and Phillips claim that Miller effectively admitted in his deposition that he has not been damaged by the alleged breach of contract.  Miller said at his deposition that

---

[6]  Because I find that Defendants are liable under Plaintiffs' contract theory of liability, the claim that Phillips breached a fiduciary duty to Miller becomes superfluous.  If required to address the issue, I would find that Phillips did not owe a fiduciary duty to Miller under the Sub-Trust Agreement.  That Agreement only created fiduciary duties for Miller, which he owed to Phillips, but not the other way around.  Indeed, Plaintiffs appeared to abandon this theory in their reply brief and at oral argument.

[7]  Beinhocker and Phillips argue a fourth reason why plaintiffs cannot show damages: if Aqua Blue was not a party to the Non-Contravention Agreement, its only recourse for damages is via the Specialty Finance Loan Agreement.  However, because I have found above that Aqua Blue, now Dukes Bridge, was an intended third-party beneficiary of the Non-Contravention Agreement, its remedy is not limited to that found in the Specialty Finance Loan Agreement.  Thus, Beinhocker's and Phillips's fourth argument regarding damages fails.

he was not aware of any lawsuits against him or the Sub-Trust, and had not lost any money as a result of the lapse of the insurance policy.[8]  Therefore, Beinhocker and Phillips argue, Miller cannot meet his burden of proof to show damages from the loss of the life insurance policy, and thus summary judgment should enter for them as to Miller's claims.

They are correct.  The Sub-Trust received the life insurance policy by assignment from the TPCS Trust.[9]  Beinhocker and Phillips caused the policy to lapse.  Thus, because of their actions, the Sub-Trust no longer owned the life insurance policy. That is, the Sub-Trust was in a worse position than before Beinhocker's and Phillips's actions.  However, while they may mean that Duke Bridge has been harmed, there has been no showing that Miller has suffered cognizable harm at this point.  Without any evidence of harm, summary judgement must enter in defendants' favor with regard to claims for damages by Miller.

_____

[8]  This is likely because section 10.12 of the Loan Agreement granted Miller immunity from liability, and because the Sub-Trust no longer had any assets which would be the subject of a suit once the insurance policy lapsed.

[9]  Beinhocker and Phillips make a half-hearted attempt to contest the validity of the assignment, claiming in a single footnote that it was ineffective to divest ownership and power from Phillips as Trustee to the TPCS Trust because John Hancock was not notified of the assignment.  But notification has never been a requirement for validity of an assignment (unless required by separate agreement or by statute), only for collection of the debt underlying the assignment—a separate issue.  *See* 29 Williston on *Contracts* § 74.3 (4th ed. 1989) (discussing the requirements for a valid assignment).

2.   *Non- and Limited-Recourse Provisions*

Next, Beinhocker and Phillips argue that their liability is limited by the Non-Recourse and Limited-Recourse provisions in the Specialty Finance Loan Agreement.  Specifically, they contend that sections 1.1,[10] 2.1(c),[11] and 9.5[12]

---

[10]  That section reads, in relevant part:

> "Loan Document" and "Loan Documents" shall respectively mean any one or more of this Loan Agreement, the Note, the Security Agreement, the Assignment, any other note, letter of credit application, guaranty, security agreement, hypothecation, assignment, mortgage, deed of trust or other instrument, agreement or document with or issued or given by the Borrower [the Sub-Trust] creating, evidencing, governing, supporting, securing, perfecting or respecting (in whole or in part) any of the Obligations, *and all waivers, consents, agreements,* reports, statements, certificates, schedules and other documents *executed by the requisite Person(s) pursuant to or in connection with any of the foregoing and accepted or delivered by the Lender [Aqua Blue].*

§ 1.1 (emphasis added).

[11]  That section reads, in relevant part:

> The Loans are non-recourse loans.  Notwithstanding anything contained herein to the contrary, the Borrower's [Sub-Trust's] obligations under this Loan Agreement may only be satisfied from and by the Collateral . . . .  The foregoing provisions of this Section 2.1© shall in no way affect, impair, or otherwise limit: (I) the indemnification obligation of the Borrower [Sub-Trust] in Section 10.3 of this Loan Agreement, or (ii) the obligation of the Borrower [Sub-Trust] pursuant to its collateral assignment of the Life Policy to the Lender [Aqua Blue] in Section 5.1 of this Loan Agreement.  *Notwithstanding any other provision of this Speciality Finance Loan Agreement or any other Loan Documents, Lender [Aqua Blue] agrees that . . . there are not any circumstances, including but not limited to the recourse obligations of the*

*Borrower [Sub-Trust], under which . . . Beinhocker will personally be responsible for any obligations owed to the Lender [Aqua Blue] or any affiliate of the Lender [Aqua Blue] or the Insured's [Beinhocker's] assets will be subject to any claims, liens or judgments of the Lender [Aqua Blue] or any affiliates of the Lender[Aqua Blue].*

§ 2.1(c) (emphasis added).

[12]   That section reads, in relevant part:

(a)  Notwithstanding any other provision hereof, the lender [Aqua Blue] (or any party appointed by the Lender [Aqua Blue]) shall have recourse against the Borrower [Sub-Trust], the Insured [Beinhocker] and Gilbert D Beinhocker in respect of the Obligations *only to the extent secured by the Collateral* (as defined and provided for under the Security Agreement), and, having realized the same, neither the lender [Aqua Blue] nor anyone acting on it's [sic] behalf shall be entitled to take any further steps against the Borrower [Sub-Trust] or the Insured [Beinhocker] to recover any sum and the right to receive any such sum shall be extinguished.

(b)  No recourse for or under any obligation, covenant or agreement of the Borrower [Sub-Trust] contained in this Loan Agreement shall be had against any trustee or agent of the Borrower [Sub-Trust] and by the enforcement of any assessment or by any proceeding, by virtue of any statute or otherwise; *it being expressly agreed and understood that this Loan Agreement is an obligation of the Borrower [Sub-Trust] and that no personal liability shall attach to or be incurred by the trustees or agents of the Borrower [Sub-Trust] or the Insured [Beinhocker] or Gilbert D Beinhocker, as such, or any of them under or by reason of any of the obligations, covenants or agreements of the Borrower [Sub-Trust] contained in this Loan Agreement or implied therefrom* and that any and all personal liability for breaches by the Borrower [Sub-Trust] of any of such obligations, covenants or agreements, either at law or by statute or constitution of every such trustee or agent is hereby expressly waived as a condition of and in consideration for the execution of this Loan Agreement.

of the Specialty Finance Loan Agreement control over the Non-Contravention Agreement's provision that Beinhocker and Phillips agreed to hold Miller and Aqua Blue (now Dukes Bridge) harmless for "any and all loss, liability, or damage resulting from any breach" as well as "any and all . . . out-of-pocket costs and expenses, including without limitation, legal fees and expenses." § 4.1.

Though Beinhocker's and Phillips's argument is poorly formed, consisting only of a recitation of the above sections of the Loan Agreement and a conclusory, and erroneous, assertion that those sections prevent them both from being personally liable, a generous reading of their briefs might develop the following argument:

Under section 1.1 of the Specialty Finance Loan Agreement, Loan Documents are defined to include "all waivers, consents, agreements . . . and other documents executed . . . in connection with any [agreement relating to the loan] and accepted or delivered by the Lender [Aqua Blue]." § 1.1.  The Non-Contravention Agreement was an agreement between the parties in connection with the Loan Agreement, and was entered into on the same day as the Specialty Finance Loan Agreement.  Aqua Blue "accepted" the Non-Contravention Agreement by entering into the

---

§ 9.5 (emphasis added).

Loan Agreement with Miller, because the Non-Contravention Agreement states that it was partial consideration to induce Aqua Blue to enter into the Loan Agreement.  Therefore, for purposes of the Loan Agreement, the Non-Contravention Agreement is a Loan Document.

Section 2.1(c) of the Specialty Finance Loan Agreement says that "[n]otwithstanding . . . any other Loan Documents, the Lender [Aqua Blue] agrees that . . . there are not any circumstances . . . under which . . . Beinhocker will personally be responsible for any obligations owed to the Lender [Aqua Blue]." § 2.1(c).  Because the Non-Contravention Agreement is a Loan Document, the Non-Contravention Agreement falls under the non-recourse provision contained in section 2.1(c), wherein Aqua Blue (now Dukes Bridge) agreed that it would not hold Beinhocker personally liable under "any circumstances."[13]  Therefore, the non-recourse provision immunizes Beinhocker from Dukes Bridge's claim for damages under the Non-Contravention Agreement. Therefore, summary judgment is appropriate as to the plaintiffs' claims against Beinhocker.

---

[13]  Section 9.5(b) of the Loan Agreement does not help Beinhocker or Phillips.  That section by its very terms is limited to claims of liability under the Loan Agreement itself.  *See* § 9.5(b) (waiving personal liability for "any of the obligations, covenants or agreements of the Borrower [Sub-Trust] *contained in this Loan Agreement* or implied therefrom . . . ." (emphasis added)).

23

Unlike Beinhocker, Phillips is liable to Dukes Bridge.  It is well established that trustees may be subject to personal liability arising from contractual relationships entered into with third parties.  Bogert on *Trusts* § 712 (6th ed. 1987); Restatement (Second) of Trusts § 262 (1959).  To be sure, this liability may be waived in the trust agreement.  Restatement (Second) of Trusts § 263.

Sections 7.08 and 8.06(b) of the TPCS Trust govern trustee liability.  Section 7.08 provides, in relevant part, that:

> any trustee serving hereunder shall not incur any liability by reason for any error of judgment, mistake of law, or action of any kind taken or not taken in connection with the administration of any trust created hereunder if in good faith reasonably believed by the trustee to be in accordance with the provisions and intent of this Trust. *This shall not apply in any matter involving the trustee's own willful misconduct or gross negligence proved by clear and convincing evidence.*

§ 7.08 (emphasis added).  Section 8.06(b) provides, in relevant part, that:

> No trustee shall be personally liable to any person or entity under any circumstances in connection with any of the transactions contemplated by this Trust, *except that such limitation shall not relieve any trustee of personal liability it may have for such trustee's own bad faith, willful misconduct or gross negligence.*

§ 8.06(b) (emphasis added).

There is no basis in the record before me to dispute that Phillips's decision to take out the John Hancock loan which caused the policy to lapse was at least grossly negligent if not

fundamentally fraudulent.  Phillips's deposition is replete with examples of his willful ignorance of his duties as trustee of the TPCS Trust.  *See, e.g.*, Phillips Dep. 74:17-75:1 ("Q.  Even as a trustee of a trust that has ownership over the life policies, you could care less as to who paid the premiums on those policies?  A.  That's correct.  Q.  So you didn't take your fiduciary obligations as a trustee too significantly, did you?  Mr. Connelly: Objection.  Q.  How would you describe - - A. Casual."); *id.* 91:8-24 ("Q.  This is a non-contravention agreement.  Want to turn to the last page of this document for me.  That's your signature, right?  A.  Looks like it. . . . Q. You received this document, correct?  A.  I signed this document. Q.  Did you read this document before you signed it?  A. Probably not.  Q.  But maybe?  A.  It's possible.  It's short enough that I might have.  Q.  Talk to anybody about the responsibilities within it?  A.  Not that I recall.").  And Phillips admitted, when informed of the terms of the agreements and responsibilities of which he was purportedly ignorant, that his actions had contravened those agreements and responsibilities.  *See* Phillips Dep. 106:15-21 ("Q.  You took a loan against the policy, you and Mr. Beinhocker?  A.  That's correct.  Q.  Your actions were in direct violation of this contractual obligation, correct?  Mr. Connelly: Objection.  A. It appears that way."); *id.* 114:13-18 ("Q.  He and you signed

this agreement, correct?  A.  Correct.  Q.  He and you both
promised not to take out that loan?  Mr. Connelly: Objection.  A.
It appears that way.").

It is plain that a trustee is grossly negligent when his
action on behalf of a trust directly contravenes an agreement of
the trust, as to the terms of which he was willfully ignorant.
Therefore, the TPCS Trust Agreement's provisions immunizing
Phillips from liability do not apply, and he is liable for the
breach of the Non-Contravention Agreement.

3.   *Any Damage Award Must be Limited to $200,000*

Finally, Beinhocker and Phillips argue that if they are
liable, their liability must be capped at $200,000, the amount of
the loan they took out.  This is clearly incorrect.  Beinhocker
and Phillips admitted that they knew that by taking out the loan
they would cause the $10 million life insurance policy to lapse.
They knew that if the policy lapsed, the collateral for the loan
would evaporate, and the Sub-Trust would lose its ability to
repay Aqua Blue for the loan used to pay the first and second
year insurance premiums.  Thus the lost insurance premiums were
the proximate result of Beinhocker's and Phillips's breach.

The Non-Contravention Agreement makes clear that such
damages were also within the contemplation of the parties at the
time the Agreement was made.  Thus, Phillips's liability is not
limited to the value of the loan he and Beinhocker took out which

in turn caused the lapse in the insurance policy that they intended. *See Pierce* v. *Clark*, 851 N.E.2d 450, 454 (Mass. App. Ct. 2006) ("The rule of damages in an action for breach of contract is that the plaintiff is entitled in general to damages sufficient in amount to compensate him for the loss actually sustained by him, and to put him in as good position financially as he would have been in if there had been no breach . . . . He may not insist upon extraordinary or unforeseen elements of damage, but only such as flow according to common understanding as the natural and probable consequences of the breach and such as may be presumed to have been in the contemplation of the parties at the time the contract was made." (quotations and citations omitted)).

## IV. CONCLUSION

For the reasons set forth above, I GRANT Plaintiffs' motion for summary judgment (Dkt. No. 31) as to the Dukes Bridge contract claims against Phillips; and GRANT Defendants' cross-motion for summary judgment (Dkt. No. 38) as to the claims of Miller and the claims against Beinhocker.  The parties shall make submissions by October 5, 2012 proposing a procedure for bringing this case to final judgment by resolving the precise damages to be awarded to Plaintiffs in this case.

*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT